PER CURIAM.
This case requires us to determine whether appellant Capital Terminal Company was entitled to reach a jury on its claim that certain improvements to a fire suppression system were required by “regulations” under the terms of its written agreement with appellee Getty Properties Corporation. At the conclusion of appellant’s case, the district court granted ap-pellee’s motion for judgment as a matter of law because, in the court’s view, appellant had failed to establish a basis for instructing the jury on the content of such regulations, and hence could not link the required improvements to those regulations. We affirm.
I.
Appellant Capital Terminal Company (Capital) owns the Wilkesbarre Pier (the Pier) in East Providence, Rhode Island. The Pier is used primarily for offloading petroleum — mostly gasoline and home heating oil — from barges and deep water vessels. Two pipelines begin on the Pier and extend approximately 2.5 miles to a pair of underground oil terminal facilities located in East Providence.[1] Capital owns one of the underground terminals; appel-lee Getty Properties Corporation (Getty Properties) owns the other and leases it to Getty Petroleum Marketing, Inc. (Getty Marketing). Getty Properties álso owns a usage interest in the Pier.
An Operating Agreement executed in 1975 governs the parties’ relationship regarding costs associated with the Pier. In 1997, a dispute arose over the nature and extent of repairs to the Pier. As a result of this dispute, the parties, including Getty Properties and Capital’s predecessor in interest, agreed to a First Amendment to the Operating Agreement.. That amendment provides that Getty Properties is responsible for “[t]he cost of compliance with all City, State, or Federal regulations applicable to the operation of the pipelines.” The term “regulations” is not defined in the Operating Agreement or the First Amendment to the Operating Agreement.[2]
Before 1992, the closest source of pressurized water to the Pier was a hydrant located on neighboring property owned by *315 the Union Oil Company of California (Unocal). In the event of a fire, water from the hydrant would have been used to spray fire-retardant foam onto the pipelines. In 1992, the East Providence Water Department shut off water to the hydrant because it was concerned that chemicals from Unocal’s operations might contaminate the water supply. This action left the Pier without sufficient ability to suppress a fire on the pipelines. The parties that used the Pier began to discuss this problem as early as 1994.
In 1997, the East Providence Fire Department contacted Capital about the lack of a pressurized water supply on the Pier. Beginning in 1998 and continuing until 2000, Capital attended a series of meetings (the Advisory Group meetings) at the Coast Guard’s Marine Safety Office. At these meetings, representatives of Capital, Unocal, the Coast Guard, the State Fire Marshal’s Office, and the East Providence Fire Department discussed how best to provide adequate fire suppression services to the Pier. A representative of Getty Marketing also attended several of the Advisory Group meetings. The parties dispute whether the representative of Getty Marketing also represented Getty Properties.
On May 8, 2000, Capital wrote a letter to Gerald A. Bessette, Chief of the East Providence Fire Department, setting out a proposal for fire suppression at the Pier. It included four specific measures: extension of an existing water main to the Pier, purchase of a mobile Foam Tote Trailer that the Fire Department could use to suppress a fire anywhere in the city, installation of a radio signal alarm box at the Pier, and purchase of a portable chemical fire extinguisher to be housed at the Pier. The letter stated that “[t]he estimated total cost for the four ... improvements is approximately $200,000.” It appears that Capital anticipated paying for these improvements, as the letter stated that “[t]his amount is a major expenditure for [Capital], and represents a hardship, above which we cannot extend ourselves.”
On May 12, 2000, the Advisory Group, including representatives of both Capital and Getty Marketing, as well as Chief Bessette, discussed Capital’s proposal. The minutes from the meeting state that “[a]ll of the key players agreed to the following proposal (summarized) ... submitted by Capital.” The proposal listed in the minutes included all four measures outlined in Capital’s May 8, 2000, letter, plus the additional measure of installing a pipeline from the head of the Pier to a separate manifold area of the Pier.
On May 17, 2000, Chief Bessette sent a letter to Capital, Getty Marketing, and Getty Properties, stating that “[a]s a result of a number of [Advisory Group] meetings ... in regard to a lack of adequate fire protection at the Wilkesbarre Pier, the following are minimal acceptable improvements to that facility.” The letter then listed the five improvements that the Advisory Group had agreed upon during its May 12, 2000, meeting. Shortly thereafter, Capital demanded that Getty Properties pay for the cost of implementing the improvements listed in Chief Bessette’s letter, contending that those improvements were required by “regulations” under the terms of the Agreement between the parties.
II.
On August 2, 2000, Getty Properties and Getty Marketing sought a declaratory judgment from the district court that they were “not obligated to install a water line or fire suppression system for the pier.” On September 8, 2000, Capital filed a compulsory counterclaim seeking $800,000 to cover the costs of the fire suppression system that it had already begun to install. *316 The district court divided the trial into two phases. In phase one, the court tried Capital’s counterclaim before a jury.[3] In phase two, tried at a later time, the court conducted a bench trial to address Getty Properties’s and Getty Marketing’s declaratory judgment action.[4]
During the jury trial, Capital introduced into evidence the historical documents governing interests in the Pier, including the Agreement between Capital and Getty Properties obligating Getty Properties to pay “[t]he cost of compliance with all City, State, or Federal regulations applicable to the operation of the pipelines.” Capital also introduced a report written by Orville Slye, a consultant hired by Capital to assess the fire suppression needs on the Pier. That report had been presented to the Advisory Group and had been used by Capital in developing its proposal for fire suppression on the Pier. Capital also introduced the minutes of the Advisory Group meetings.
At the close of Capital’s case, Getty moved for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a)(1). Getty argued that “[t]here has been absolutely no testimony here regarding any particular regulation or any rule of law that Getty Properties did not comply with.” This statement somewhat misstates the issue that was before the court. The issue was not whether Getty Properties had failed to comply with any regulation or rule of law. Rather, the issue was whether the improvements listed in Chief Bessette’s letter were required in order to comply with “regulations” as that term was used in the Agreement, and therefore whether Getty Properties was responsible for paying the cost of installing those improvements.
In response to this motion, the court pressed Capital to “point [the court] to the regulation which requires the installation of the fire suppression system that you seek compensation for.” Capital directed the court to R.I. Gen. Laws § 23-28.22-5,[5] which with an exception not relevant here, states: “The construction, installation, use, storage, and maintenance of facilities storing, using, and dispensing flammable and combustible liquids within the scope of this chapter shall be in accordance with N.F.P.A. Standard 30, 1987 edition.” Capital asserted that the 1987 edition of the National Fire Protection Association Standard 30 (NFPA 30), a “Flammable and Combustible Liquids Code” developed by a nongovernmental entity, was incorporated into Rhode Island law pursuant to R.I. Gen. Laws § 23-28.22-5, and thus constituted a “regulation” for the purposes of the Agreement.[6]
*317 The court asked Capital where the regulation was and Capital responded, “I can get a copy, I suppose.” When asked whether it was introduced into evidence, Capital responded, “It’s a matter of law, your Honor.” The court continued to push Capital, stating, “Show me the Rhode Island Building Code which you say has force of law,” to which Capital responded, “I don’t have the building code.” The court articulated its belief that the Standard should be part of Capital’s papers in the case.
The court then asked for the citation. Capital responded, “It is NFPA 30 and the Rhode Island Building Code, your Honor, and I will find it and bring it to you, I promise, or at least I should say I will find it and try to bring it to you.” The court stated that the violation of a regulation was the “bedrock of [Capital’s] claim against Getty” and that it was Capital’s “obligation as the party pressing the claim not only to set forth the facts that support [the] claim but to set forth the law.” The court observed that Capital had not cited a specific provision of NFPA 30 that required the introduction of the fire suppression equipment, let alone given the court a copy of NFPA 30:
[Y]ou rested, but you have not directed me to any specific regulation.... But I’m asking you to give me a copy of the regulation that you say supports your argument on this point. Because if it’s not there ... you will lose on this claim. It’s as simple as that.
Noting that it had looked unsuccessfully for NFPA 30, the court took a short recess to give Capital time to obtain a copy.
After a recess, the court asked counsel for Capital whether he was “able in the recess to identify a specific statute, ordinance, regulation, anything that specifically covers the fire suppression system that we’ve been talking about[.]” Capital simply offered R.I. Gen. Laws § 23-28.22-5; counsel admitted that he had a 2000 edition of NFPA 30 but not the 1987 edition. The court stated:
The problem I have is this. This statute makes reference to a document. It is not incorporated, that is, the text of the document is not incorporated into the statute. There is nothing before this jury from which it can make a determination that Getty had an obligation to comply with certain provisions.
The court noted that Slye, Capital’s expert, never stated what was required by NFPA 30; in fact, he stated that his own recommendations exceeded NFPA 30’s requirements. The court continued to press Capital:
Where is there anything in the record other than the reference to this standard or set of standards that addresses the precise issue in this case.... All you have is the reference.
The court then commented ominously on the significance of NFPA 30’s absence from the case: “Nobody knows what it says at this point, but most importantly the jury and I do not know what it says.” Capital responded that the court was confusing issues of law with issues of fact:
It’s not a question of fact, your Honor. This is a question of law.... [Y]our Honor wouldn’t give [the jury] the statute. Your Honor would, I suspect, charge as to what the law is. If your *318 Honor believes that NFPA 30 is now the building code law of the State of Rhode Island, I would expect you to charge that. I believe that if I had tried to offer either the General Laws or [NFPA 30] in evidence, that an objection would have been made and sustained. It’s a matter of law.
The court was not convinced by Capital’s argument, noting, “I’m not so sure.... But I think you’ve got a hole in your case.”
Capital continued:
The point of the matter is that this is now a matter of law. We will submit a memorandum at the earliest possible time, and it will be quickly, to show you what NFPA 30 is and. that it is the law and ask you to charge the jury accordingly.
The court reminded Capital, “I need the '87 version,” and asked, “Who’s got it?” Although counsel offered to get a copy of the 1987 edition of NFPA 30, the court said it was “too late” and admonished that “[i]f this is what your client is hanging its hat on, this is something that should have been provided to the Court a long time ago, not now.”
The district court granted Getty Properties’s motion for judgment as a matter of law.[7] In reaching its conclusion, the court probed the nature of NFPA 30. The court noted that NFPA standards were promulgated by the National Fire Protection Association, which is a private industry board. From an evidentiary standpoint, the court believed that because the private standard was not incorporated into the text of the state statute, but rather was simply referenced, Capital was required to introduce NFPA 30 into evidence. 'The court believed that the problem with Capital’s case was that, “even taking all of the [evidence introduced at trial] into account, there is absolutely not one shred of evidence in the case linking the [recommendations of Chief Bessette] to the 1987 edition of NFPA 30.”
In its written order of December 20, 2002, the court further explained its decision, stating the “dispositive issue” was “whether there was any evidence that the items listed in Chief Bessette’s letter were in accordance with the standards set forth in NFPA 30, 1987 edition.” The court noted that “[t]he NFPA 30, 1987 edition manual was never offered as an exhibit, and is not part of the evidence in this case.” It further stated that “the only testimony concerning what was or was not required on the Pier in the way of fire protection equipment came from Orville Slye, Jr.” The court added that the recommendations in Slye’s report, by the report’s own terms, exceeded “minimal, non-mandatory, fire protection recommended by NFPA 30.” The district court concluded that “[n]owhere does the Slye Report indicate that the recommendations contained therein are in accordance with the NFPA 30, 1987 edition. Moreover, the report does not state that recommended Pier improvements are required by statute, ordinance, or any regulation whatsoever.”
In the absence of evidence linking the improvements listed in Chief Bessette’s letter to the requirements of NFPA 30, the court determined that no reasonable jury could find that those improvements were required by “regulations.” The court stated that “[n]owhere in Chief Bessette’s letter does he reference a Rhode Island state statute, city ordinance, or other regulation requiring installation of the listed *319 items, nor does he mention the NFPA 30, 1987 edition or state that the items listed are in accordance with NFPA standards.” The court concluded that “the failure to make an evidentiary link between items listed in Chief Bessette’s letter with a corresponding regulation is fatal to plaintiffs claim.”[8]
On appeal, Capital argues that a reasonable jury could have found that the improvements listed in Chief Bessette’s letter were required by “regulations.” Capital’s primary arguments are that (1) the court should have taken judicial notice of the contents of NFPA 30 because NFPA 30 is part of Rhode Island law and thus the judge was responsible for instructing the jury as to its requirements, and (2) the evidence at trial indicated that the improvements in Chief Bessette’s letter were required by the regulatory authority of the City of East Providence, the State Fire Marshal, and the Coast Guard.[9]
III.
“We review the grant of a motion for judgment as a matter of law de novo.” McLcme, Graf, Raulerson & Middleton, P.A. v. Rechberger, 280 F.3d 26, 39 (1st Cir.2002). In ruling on Getty Properties’s Rule 50(a) motion, the district court held that the jury could not decide whether “Getty [Properties] had an obligation to comply with certain provisions” of NFPA without a copy of NFPA 30 being presented.
The contract language at issue provides that Getty Properties is responsible for “[t]he cost of compliance with all City, State, or Federal regulations applicable to the operation of the pipelines.” Although *320 the word “regulations” is not defined in the contract, the word unmistakably means that Getty Properties is only responsible for the cost of improvements required by city, state, or federal law.[10]
We deal quickly with Capital’s second argument that independent of NFPA 30, the evidence introduced at trial permitted a jury to find the improvements were required by city, state, or federal regulations, and thus Getty was liable for the cost of the improvements to the Pier. That is simply not so. Even Capital’s expert did not testify to that effect, but rather said the plan exceeded the NFPA recommendations. Indeed, Capital’s main argument, then and now, turns on the assertion that the Rhode Island statute which references NFPA 30 requires the improvements made to the Pier and is the regulation which, under the Agreement, makes Getty responsible.
We now turn to this argument. Capital contends that the court should have determined the requirements of Rhodé Island law pursuant to its responsibility to determine the law applicable to the case, and then instructed the jury on those requirements. Since Rhode Island law provides that “facilities storing, using, and dispensing flammable and combustible liquids within the scope of this chapter shall be in accordance with N.F.P.A. Standard 30, 1987 edition,” R.I. Gen. Laws § 23-28.22-5 (emphasis added), Capital argues, NFPA 30 is part of the law of Rhode Island and hence, as argued in its brief, “[i]t was never [Capital’s] obligation to prove what the law is.” Capital maintains the court was obligated to take judicial notice of the law, in this case, NFPA 30. Although counsel did not use the words “judicial notice” in his argument before the district court, we will take it, in his favor, that the court understood his request in those terms.
We disagree, however, that the court was required to take judicial notice of NFPA 30. After Getty moved for judgment as a matter of law pursuant to Fed. R.Civ.P. 50(a)(1), the court asked Capital for a copy of NFPA 30, referenced in Rhode Island General Laws § 23-28.22-5. The court indicated that it had looked for a copy and was unable to locate one. After a brief recess, Capital still could not provide the court with a copy; Capital simply pointed to-the Rhode Island statute that referenced the standard. On appeal, Capital’s argument is that the court was required to take judicial notice of NFPA 30, regardless.
Generally, in the federal system, “[t]he law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United States are bound to take judicial notice without plea or proof.” Lamar v. Micou, 114 U.S. 218, 223, 5 S.Ct. 857, 29 L.Ed. 94 (1885); White v. Gittens, 121 F.3d 803, 805 n. 1 (1st Cir.1997). Municipal ordinances and private codes referred to in statutes historically have not been included within this general rule of judicial notice of law. Under traditional rules, even a municipal ordinance must be put into evidence. See Gardner v. Capital Transit Co., 152 F.2d 288, 290 (D.C.Cir.1945)(affirming trial court’s refusal to take judicial notice of or instruct the jury regarding a District of Columbia ordinance that appellant had not proven, because “municipal ordinances may not be judicially noticed by courts of general jurisdiction”); Robinson v. Denver City *321 Tramway Co., 164 F. 174 (8th Cir.1908)(“[T]o make [an ordinance] available in establishing a charge of negligence, it must be pleaded, like any other fact of which judicial notice will not be taken.”); Town of Lincoln v. Cournoyer, 95 R.I. 280, 186 A.2d 728, 730 (1962) (“It is generally held that the doctrine of judicial notice will not be extended to the enactment of specific municipal ordinances or to the specific provisions of such municipal ordinances.”); 2 John Strong, McCormick on Evidence § 335 (5th ed. 1999)(“Private laws and municipal ordinances ... are not commonly included within the doctrine of judicial notice of law and these must be pleaded and proved.”); 9 Wigmore, Evidence, § 2572 (Chadbourn rev. 1981) (“[OJrdi-nances and regulations of local government boards and councils are usually not noticed.”).
We do not know if the court would have taken judicial notice of NFPA 30, if Capital had provided the district court with an appropriately certified copy of the 1987 version of it. But Capital chose not to do so (and apparently did not itself have the correct version of the Standard). Nor was NFPA 30 readily available.
Indeed the court informed Capital that it had tried to find the correct version and had been unsuccessful. Even those courts which have more liberally construed the rules of judicial notice as to local ordinances and codes do so only when the law to be noticed is readily available and there are no issues about accuracy or authenticity. See Melton v. Oklahoma City, 879 F.2d 706, 724 n. 25 (10th Cir.1989)(taking judicial notice of matters when they are not subject to reasonable dispute and the accuracy cannot be questioned); Newcomb v. Brennan, 558 F.2d 825, 829 (7th Cir.1977) (noting that city ordinances can be judicially noticed because they fall within the category of “common knowledge”). That is the opposite of this situation.[11]
The court’s conclusion that Capital’s case failed for lack of an essential element of the case was correct, and the court properly entered judgment as a matter of law for Getty, pursuant to Fed.R.Civ.P. 50(a)(1). Accordingly, we affirm the decision of the district court. Costs are awarded to Getty.

. The parties dispute ownership of these pipelines. However, the issue of ownership of the pipelines is not before this court on appeal.

. Hereinafter, we refer to the Operating Agreement and the First Amendment to the Operating Agreement collectively as "the Agreement."

. Phase one also included Getty Marketing’s claim that Capital had breached a separate agreement' — the "Throughput Agreement”— by failing to make certain repairs to the Pier. That claim is not before us on appeal.

. Phase two also included other claims by Getty Properties and Getty Marketing that are not relevant to the issues on appeal.

. In June 2004, Rhode Island repealed R.I. Gen. Laws § 23-28.22-5 and other portions of Chapter 23 as part of an overhaul of its fire safety laws. See 2004 R.I. Pub. Laws 225. However, to properly address whether the improvements listed in Chief Bessette’s letter of May 17, 2000, were "regulations,” we refer to Rhode Island law as it existed at the time of that letter, that is, the provisions in effect in 2000.

.R.I. Gen. Laws § 23-28.22-1 governs the applicability of R.I. Gen. Laws § 23-28.22-5. It provides that the provisions of Chapter 28.22 ("Flammable and Combustible Liquids”) "shall not apply to existing buildings, plants, structures, or equipment now used for flammable liquids unless the enforcing officer shall determine that the conditions constitute a distinct hazard.” R.I. Gen. Laws § 23-28.22-l(b). The record indicates that the pipelines in this case qualify as "existing buildings, plants, structures, or equipment.” *317 However, the district court found that, "[g]iv-ing [Chief Bessette’s letter] the most generous reading that I can and drawing all reasonable inferences in favor of Capital Terminal,” Chief Bessette had determined that the lack of a fire suppression system on the pier was a distinct hazard. The district court therefore determined that "the flammable and combustible liquids chapter of the Rhode Island General Laws does apply.”

. The jury trial continued on Getty Marketing's claim that Capital had breached the "Throughput Agreement.” On December 19, 2002, the jury found in favor of Getty Marketing and awarded damages of $100,000.

. On June 23, 2003, the court proceeded to phase two of the trial. At the conclusion of phase two, it ruled that Getty Properties had failed to prove that it was not obligated to install a fire suppression system on the Pier. Capital contends that the district court's grant of Getty Properties's Rule 50 motion in phase one of the trial is inconsistent with its ruling against Getty Properties in phase two of the trial. There is no necessary inconsistency in these two rulings. The Rule 50 motion argued only that Capital had not introduced sufficient evidence to demonstrate that the improvements listed in Chief Bessette’s letter were required by “regulations.” That ruling, however, did not require the district court to hold, in phase two of the trial, that Getty Properties had met its burden to demonstrate that it was not obligated to install a fire suppression system on the Pier. In its phase two decision, the court explained that its ruling in phase one of tire trial (addressing Capital’s counterclaim) had not decided Getty's declaratory judgment claim on the merits:
As the party seeking the declaratory judgment, Getty [Properties] had an obligation to come forward with evidence that established, for instance, that the installation of the fire suppression equipment on the Wilk-esbarre Pier is not required by city, state, or federal regulation, or, in other words, that it has no obligation to install such equipment on the Pier. In this, it failed.

. Capital also argues that it was “ambushed” by Getty Properties's Rule 50(a) motion because Getty Properties had admitted in its pleadings that the improvements listed in Chief Bessette’s letter were “required.” In its Second Amended Complaint, Getty Properties states:
Through its Fire Chief, the City of East Providence has indicated that there is inadequate fire protection on the Pier and has set forth certain minimum requirements for necessary improvements to the Pier or else the Pier will be closed.
Capital over reads the statement, which does not admit that the improvements listed in Chief Bessette’s letter were required by "regulations.” The statement just acknowledges the obvious fact that the Chief required the improvements. Moreover, Capital did not raise this "ambush” argument before the district court until phase two of the trial, well after the court had ruled on Getty Properties’s Rule 50 motion. Therefore, even if the “ambush” argument had any validity, it has been forfeited. See, e.g., Violette v. Smith & Nephew Dyonics, Inc., 62 F.3d 8, 10 (1st Cir.1995).

. The district court opinion confirms that "[t]he parties do not. dispute that the term 'regulation', which is not defined in the Operating Agreement, refers to a rule or order having the force of law.”

. At least one member of the majority has reservations about the analysis set forth in the concurring opinion.